**ASSOCIATED METALS & MINERALS CORP., Plaintiff,**

v.

**UNITED STATES, Defendant.**

C.D. 4143; Protest Nos. 66/1272–520–64, 66/2683–1108–64, and 66/14957(B)– 13774–64.

United States Customs Court, Second Division.

Dec. 8, 1970.

Rode & Qualey, New York City (Ellsworth F. Qualey, New York City, of counsel) for plaintiff.

Carl Eardley, Acting Asst. Atty. Gen. (Harold L. Grossman, New York City, trial attorney), for defendant.

Before RAO, Chief Judge, and FORD, and NEWMAN, Judges.

NEWMAN, Judge:

These three consolidated protests concern the proper rate of duty on certain metal articles imported from West Germany in 1962.

The merchandise is described on the commercial invoices as "Muntz Metal Plates" and "Tube Sheet blanks, Muntz metal, hot rolled" in protests 66/1272 and 66/14957(B) respectively. These articles were assessed with duty by the Government at the rates of 17 or 19 per centum ad valorem, depending on

the date of entry, pursuant to the provisions of paragraph 397 of the Tariff Act of 1930, as modified, covering "Other" articles not specially provided for, whether partly or wholly manufactured, composed wholly or in chief value of brass.

In protest 66/2683, the merchandise is described on the commercial invoice as "Copper-Silicon Alloy Condenser Plates" and was assessed with duty under paragraph 397, as modified, at the rate of 19 per centum ad valorem as "Other" articles not specially provided for, whether partly or wholly manufactured, composed wholly or in chief value of bronze.

The merchandise covered by the instant protests was also assessed with an internal revenue tax based upon the copper content, but such tax is not in controversy. Plaintiff's sole claim is that the imported merchandise is properly dutiable at the rate of 2 cents per pound under the provision in paragraph 381, as modified, for brass plates.[1]

We sustain the protests.

THE STATUTES

Classified under:

Paragraph 397 of the Tariff Act of 1930, as modified by T.D. 54108:

Articles or wares not specially provided for, whether partly or wholly manufactured:

\*　　　\*　　　\*　　　\*　　　\*

Composed wholly or in chief value of iron, steel, copper, brass, nickel, pewter, zinc, aluminum, or other base metal (except lead), but not plated with platinum, gold, or silver, or colored with gold lacquer:

\*　　　\*　　　\*　　　\*　　　\*

Other, composed wholly or in chief value of iron, steel, brass, bronze, zinc, or aluminum \* \* \* ....19% ad val.

Paragraph 397 of the Tariff Act of 1930, as modified by T.D. 55615:

Articles or wares not specially provided for, partly or wholly manufactured, not plated with platinum, gold or silver, and not colored with gold lacquer:

\*　　　\*　　　\*　　　\*　　　\*　　　\*

Composed wholly or in chief value of iron, steel, copper, brass, nickel \* \* \*

---

[1]. Plaintiff claimed at the trial and in its brief that the articles are dutiable under paragraph 381 "either as sheets or plates of brass or bronze." However, the claim that the articles are *sheets* was not pursued either by the presentation of evidence or by argument in plaintiff's brief. Therefore, we shall consider the claim that the imports are "sheets" as having been abandoned.

＊　　＊　　＊　　＊　　＊　　＊

Composed wholly or in chief
value of brass or bronze
＊　＊　＊..............17% ad val.

Claimed under:

Paragraph 381 of the Tariff Act of 1930, as modi-
fied by T.D. 51802:

Brass rods, sheet brass, brass plates, bars,
and strips, Muntz or yellow metal sheets,
sheathing, bolts, piston rods, and shaft-
ing ..............................2¢ lb.

Bronze rods and sheets .................2¢ lb.

[A3401]

## THE RECORD

The record herein consists of the tes-
timony of three witnesses and four ex-
hibits introduced in evidence by plain-
tiff. Defendant presented no evidence.
There appears to be no controversy as
to the pertinent facts, which may be
summarized as follows:

Plaintiff, an importer of metals and
minerals, purchased the involved mer-
chandise from Vereinigte Deutsche Met-
allwerke of Frankfort, Germany, and
sold the merchandise in its imported con-
dition to Ingersoll-Rand Company of
Phillipsburg, New Jersey. Plaintiff or-
dered the merchandise in accordance
with drawings and specifications sub-
mitted by Ingersoll-Rand.

The imported articles were flat, 1¼
to 1½ inches thick, and five-sided in
shape. They were of substantial size:
one for example measuring 11 feet wide
at the base, 11 feet 6 inches high on one
side, 6 feet across the top, and 3 feet 6
inches on the other "side", weighing
6,970 pounds. Although the specific di-
mensions and shape of the imported
articles varied in the three shipments,
the following drawing illustrates gen-
erally their appearance.

The imported articles were produced
as follows:

The first step was to melt the "right"
alloy and to cast plates having a thick-
ness of about 10 to 12 inches with a
weight of about four to six thousand
pounds each. The length and width of
these cast plates were related to the
product to be produced. After casting,
the plates were heated in a furnace to
a high temperature to give them a cer-
tain plasticity for hot working in a roll-
ing mill. The plates were then "cross
rolled," meaning that the rolling direc-
tion was changed during the operation.
By cross-rolling, a plate can be produced
which has a thickness, length and width
close to the desired product. The im-
ported plates were cross-rolled "so close
as possible to the trapezoidal shape
shown in the drawing," and were not
initially in rectangular shape. After
hot-rolling, the next step was the shear-
ing operation by which the plates were
cut to the size specified in the draw-
ing. After shearing, there was a scrap
loss of at least 25 per cent.

The imported articles were custom-
made or specialized forms produced to
plaintiff's specifications, and were not
standard mill products [2] in the sense that
one would find in a warehouse; but they
were "mill products" in the sense "that
they must be worked subsequently to
find a final use" and "are very raw

**2.** The term "mill products" is a trade
designation which refers to standard size
warehouse items, and "indicate[s] some-
thing which is going to be further

processed before end use" (R.17). Mill
plates come in shapes which are rec-
tangular and circular (R.25).

products in comparison to the condenser, what is made from it."

Ingersoll-Rand, purchaser from plaintiff of the imported articles, manufactures condensers which are sold chiefly to electric utilities. A condenser is employed by the electric utility to reconvert steam "exiting" from a turbine back into water to be recycled into the boiler for reuse.

After the imported articles were received by Ingersoll-Rand, they were manufactured into condenser tube plates, which latter "are used basically as a manifold for a tube bundle." The size and shape of the plates are dependent upon the power plant arrangement.

None of the plates purchased by Ingersoll-Rand were standard mill shapes, but rather such plates "are bought to a drawing" from a mill. Although any mill would sell plates in the shapes involved herein, they are "not something you can go to a warehouse and pick up." Condensers usually have rectangular tube plates, and the imported shapes "are definitely in the minority."

In the course of manufacturing the condenser tube plates the imported articles were drilled with approximately 10,000 holes, so that from 30 to 40 per cent of the area of the plate "is drilled out of it." The holes were then reamed. One side of the hole was "chamfered to remove any burrs," and the other side was either beveled or chamfered. Some of the material was counterbored since there was a special sealing device used, and that required an additional operation. Also, some of the imported plates were "radiused" whereby a square corner of the plate was "rerounded." Around the periphery of the plates, holes were drilled so that the tube plates could be bolted to the condenser. The plates were then shipped to Ingersoll-Rand's customer to become condenser tube plates on the condenser itself. Tubes were installed between two condenser plates; and water flows through the tubes to condense the steam from the turbine.

## QUESTIONS PRESENTED

Since the provision in paragraph 381 for "brass plates" is more specific than the basket provisions of paragraph 397, the issue is narrowed to whether the imported merchandise falls within the purview of paragraph 381 as brass plates.

Thus, we are called upon to determine initially whether the merchandise covered by all three protests is classifiable as "plates" within the purview of paragraph 381; and second, if the articles are "plates", whether the "Copper-Silicon Alloy Condenser Plates" in protest 66/2683 are classifiable as "brass" plates under paragraph 381.[3]

## THE MERCHANDISE WAS NOT ADVANCED BEYOND THE FORM OF "PLATES."

Defendant argues that the provision for brass plates in paragraph 381 covers only standard mill product brass plates, and that the imported articles were advanced in condition beyond the initial state as mere mill product brass plates. Specifically, the Government contends, "that only after the desired alloys were melted * * * cast and cross rolled * * * did we have the plates referred to in paragraph 381; and that the subsequent trapezoidal shaping and cutting to size * * * created a specially manufactured shape or article that was * * * more than a plate * * *."

We disagree.

While there do not appear to be any decisions specifically construing the term "plates" in paragraph 381, we think that the interpretation applicable to tariff provisions covering steel sheets and plates should be applied here.

In United States v. Frank, 15 Ct.Cust. Appls. 97 T.D. 42184 (1927), the ap-

---

3. Defendant concedes that the merchandise in protests 66/1272 and 66/14957 (B) described as "Muntz Metal" is brass, as classified by the collector.

pellate court had occasion to construe paragraph 304 of the Tariff Act of 1922, which covered various basic shapes and forms of steel including sheets and plates. There, the court of appeals reviewed several pertinent authorities and commented (15 Ct.Cust.Appls. at 100):

> Paragraph 304 and its predecessor paragraphs have been before the courts for construction on various occasions. We think a fair reading of these authorities will lead the mind to the conclusion that this paragraph was not intended to apply primarily to fully manufactured articles, such as were ready for their final use, *but rather to articles manufactured to a degree, but material for other subsequent manufacturing processes.* \* \* \* [Emphasis added.]

Additionally, in Stengel v. United States, 2 Ct.Cust.Appls. 137, T.D. 31663 (1911), the court of appeals held that zinc in the form and shape of, *and ready for use in its imported condition* as, tiles or tiling for walls and ceilings, was classifiable under the provision in the Tariff Act of 1909 for articles of zinc rather than under the provision for zinc in sheets. The latter provision was held to cover "sheets of zinc which retained their form and identity as such *and were intended to be used as material for manufacturing articles as distinct from articles of manufacture ready for use.*" [Emphasis added.] In *Stengel,* the court emphasized (page 139) that [t]he articles here in question \* \* \* are articles upon which no further work is necessary to be done to fit them for a specific definite use."

We find that the provision in paragraph 381 for brass plates similarly was intended to cover articles in the form of plates [4] which serve as material for further fabrication into finished articles, as distinguished from finished articles of manufacture ready for use.[5] See also Universal Shipping Co. et al. v. United States, 4 Ct.Cust.Appls. 245, T.D. 33479 (1913).

Here, the record establishes that although the imported articles were produced to definite specifications of size and shape for subsequent fabrication into condenser tube plates, the articles were not, in their imported condition, advanced beyond the state of plates to the finished articles of manufacture ready for use. The merchandise required substantial further processing by Ingersoll-Rand before becoming firmly adapted to its ultimate use. Stated differently, the imported articles constituted a material, viz. plates, for the making of tube manifolds and were not the manifolds *per se.* Although it was a convenience and saving to Ingersoll-Rand that the merchandise was shaped and sized for its special ultimate use, the merchandise was nevertheless a material in its imported condition.

Hence, although the plates were sheared to size and shape according to specification, we do not regard such shearing as an advancement of the articles beyond the plate stage, as urged by defendant. Sciaky Bros., Inc. v. United States, 40 Cust.Ct. 134, C.D. 1972 (1958).[6] Instead, it appears that such shearing was necessary to produce plates

---

4. Webster's New International Dictionary, Second Edition (1950), page 1884, defines a plate as: "1. A smooth, often nearly flat, and relatively thin, piece of material, orig. only of metal; a thick sheet, slice or lamina; esp. a perfectly flat sheet of material of uniform thickness throughout, as the back *plate* of a watch, etc.; a boiler or armor *plate.* 2. Metal in sheets, whether beaten, rolled, or cast."

5. Although not necessarily indicative of Congressional intent as to the scope of

the term plates in paragraph 381, the following comment appears in the Summaries of Tariff Information, 1948, Vol. 3, Part 5, pages 65–66: "\* \* \* Plates and sheets [brass and bronze] are the materials for high-grade builders' and cabinet hardware, especially hinges, locks, doorplates, sign plates, and similar articles; they are also used for ornamental articles and in the manufacture of electrical equipment. \* \* \*"

6. Cf. B. F. Drakenfeld & Co. v. United States, 15 Treas.Dec. 365, T.D. 28920

which met the size and shape specified by the importer.

No authority has been cited by defendant which requires plates within the purview of paragraph 381 to be standard mill plates. Moreover, there is nothing inherent in the common meaning of the term "plates" which limits it to material in stock sizes or shapes.

Under all of the facts and circumstances, we hold that the imported articles are "plates" within the meaning of that term in paragraph 381, as modified.

## THE "COPPER-SILICON ALLOY CONDENSER PLATES" ARE DUTIABLE AS BRASS PLATES UNDER PARAGRAPH 381.

Inasmuch as initially we found that the articles covered by these protests are "plates," we now reach the issue of whether the "Copper-Silicon Alloy Condenser Plates" covered by protest 66/2683 are dutiable as brass plates under paragraph 381, as claimed by plaintiff. This question arises by reason of the collector's determination that the articles were composed of bronze, and the fact that there is no specific provision in paragraph 381 for bronze plates.

Plaintiff contends that Congress recognized that bronze is a form of brass, and therefore intended the provision for brass plates to include bronze plates. It is defendant's position that bronze plates are not covered by paragraph 381 since bronze is not a form of brass. The distinction as urged by the Government, between the two terms, appears to be: both brass and bronze are copper alloys with the chief secondary alloying element of brass being zinc, while the chief secondary alloying element of bronze is tin.

Despite that distinction claimed by the Government between "brass" and "bronze", nevertheless the question remains as to whether Congress regarded bronze to be a form of brass, as argued by plaintiff.

To support its contention that Congress recognized bronze as a form of brass and therefore intended to include bronze plates within the provision for brass plates, plaintiff cites a comment in the 1929 Summary of Tariff Information, page 859. That comment so far as pertinent, states:

*Description and uses.*—Brass is an alloy containing usually 60 to 70 per cent copper, the remainder being mostly zinc. *Bronz is a form of brass* in which tin replaces a considerable portion of the zinc. Muntz or yellow metal is brass. [Emphasis added.]

It is well settled that the 1929 Summary of Tariff Information which was before Congress at the time of the passage of the Tariff Act of 1930, is authoritative for the purpose of resolving questions relating to the meaning and scope of provisions in the 1930 Act. Textile Printing & Finishing Co., Inc. v. United States, 49 CCPA 24, C.A.D. 789 (1962); United States v. J. Eisenberg, Inc., 43 CCPA 105, C.A.D. 616 (1956). Plainly, Congress is deemed to be "chargeable with notice of comments contained in the 1929 Summary of Tariff Information, which was before it at the time of the enactment of the Tariff Act of 1930 * * *." Edward Hyman Co. v. United States, 52 Cust.Ct. 133, 141, C.D. 2450 (1964), aff'd, 52 CCPA 51, C.A.D. 857 (1965).

In light of the significant comment quoted from the 1929 Summary, we adopt the construction urged by plaintiff that, Congress considered

(1908), wherein it was held that the provision for copper in plates not manufactured, in paragraph 532, Tariff Act of 1897, did not include plates subjected to a planishing process involving "a somewhat elaborate process of grinding and polishing, which greatly enhances the value of the articles", and was necessary to make the plates ready for use by engravers. (Rev'd on other grounds, 17 Treas.Dec. 497, T.D. 29811 (1909); aff'd, 19 Treas.Dec. 424, T.D. 30549 (1910).)

bronze to be a form of brass and intended bronze plates to be included within the scope of "brass plates" in paragraph 381.

The protests are sustained, and judgment will issue accordingly.