STENGEL *v.* UNITED STATES (No. 584).[1]

SHEETS OF ZINC ENAMELED AND A SUBSTITUTE FOR TILES.

The importation consisted of sheets of zinc on which several coats of enamel had been applied, one coat at a time, and after each application, baked in an oven. The processes involved, besides, the use of a power press in printing various colors on sundry of the zinc sheets, while all were varnished, embossed, and made true to edges, the completed article having the appearance of artificial tile; *Held,* the importation is not to be classified as zinc in sheets coated or plated with nickel or other metal or solutions, but as zinc partly or wholly manufactured, and they are dutiable under paragraph 199, tariff act of 1909.—Lunham *v.* United States (T. D. 31569); Langerman & Petty *v.* United States (75 Fed. Rep., 1), and Dejonge *v.* Magone (153 U. S., 562) distinguished.

United States Court of Customs Appeals, May 29, 1911.

APPEAL from Board of United States General Appraisers, G. A. 7145 (T. D. 31164).

[Affirmed.]

*B. A. Levett* for appellant.

*D. Frank Lloyd,* Assistant Attorney General (*Thomas J. Doherty* on the brief), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MONTGOMERY, Presiding Judge, delivered the opinion of the court:

This is an appeal from the decision of the Board of General Appraisers affirming the assessment of the surveyor of customs at the port of Pittsburg on certain merchandise reported to him to consist of "zinc enamel sheets." The articles were assessed for duty at the rate of 45 per cent ad valorem under the provisions of paragraph 199 of

the tariff act of 1909 for articles composed of "* * * zinc
* * * or other metal, and whether partly or wholly manufactured,
forty-five per centum ad valorem." They are claimed by the im-
porter to be dutiable at 1¾ cents per pound under paragraph 194 of
the tariff act of 1909 as "zinc * * * in sheets, coated or plated
with nickel or other metal, or solutions."

The importation consists of zinc in the form and shape of, and ready
for use in their imported condition as, tiles or tiling for walls and ceil-
ings and borders of the same. Some of the articles are 16½ by 22
inches and the borders measure 5 by 22½ inches.

The evidence shows that the sheets of zinc are first thoroughly
cleaned, then given two or three coats of enamel, the sheets being put
into an oven and baked at a temperature of 150° after each coat.
Then such of the articles as are to be lithographed are placed in a
power press and printed from lithographic stones, one color at a time,
and after each printing a baking as before. The later processes, which
are applied to all the goods, are varnishing, embossing, with dies spe-
cially made in appropriate designs, and finally the truing of the edges
so as to make faultless joints when the tiles and borders are put upon
the wall. Illustrative exhibits showing these successive steps are in
evidence. When completed, the article presents the appearance of
artificial tile. The indentations forming the squares in the tile are
made by a press which is called an embossing press. It leaves these
indentations or lines, and the lines have a special color. The evidence
does not very clearly show how this coloring of the lines is produced,
but it is material as affecting the appearance of the product.

Paragraph 194 reads as follows:

Zinc in blocks or pigs and zinc dust, one and three-eighths cents per pound; in
sheets, one and five-eighths cents per pound; in sheets coated or plated with nickel
or other metal, or solutions, one and three-fourths cents per pound; old and worn-out,
fit only to be remanufactured, one cent per pound.

It is obvious, both from the term employed, "zinc in sheets," as
well as from the correlation of the terms employed in the paragraph,
that the merchandise intended to be covered by this paragraph was
sheets of zinc which retained their form and identity as such and were
intended to be used as material for manufacturing articles as distinct
from articles of manufacture ready for use.

Langerman & Petty v. United States (75 Fed. Rep., 1) is clearly
distinguishable from the present case. The evidence in that case
showed that the importation consisted of ordinary zinc sheets just
as they came from the rolling mill, with a coating for the special
purpose of lithographers. The importation varied in size from 10
by 14 inches to 34 by 48 inches. It was said—

Even if the coating for a special purpose has advanced the articles so that they may
be adapted to a different purpose, they still remain zinc in sheets. There is no evi-
dence that they are not sold by weight, or that they are commercially known by any

name other than lithographic zinc sheets. I think such large flat strips of zinc in the form in which they come from the rolling mill are zinc in sheets, and specially provided for under paragraph 213 of said act,

referring to the act of 1897, which corresponds to the paragraph in question here.

But in the present case the articles in question are something more than sheets, within the ordinary dictionary definition of that term. They are not flat, but have been given a different form and appearance. They owe their individuality and attractiveness to additional processes, and they are fully fitted for use as a distinct article, and are ready to be placed upon the wall in the form in which imported. They are also given a different name, such as excelti, meti, and enametile, which are trade names and are referred to in the trade as metal tiles.

It is unnecessary to determine whether the fact of commercial designation has been proved, as it is obvious from an inspection of the samples themselves that they would no longer retain the name of zinc in sheets, and an order given for zinc in sheets would not be understood to cover such articles as are here imported.

The case presents a question very similar to that involved in Lunham *v.* United States (2 Ct. Cust. Appls., 1; T. D. 31569), in which it was held that steel shapes, ready to be enameled and converted into pitchers, knobs, handles, spouts, etc., are properly held dutiable as articles composed of steel, whether partly or wholly manufactured. See also United States *v.* Prosser (1 Ct. Cust. Appls., 22; T. D. 30848); Meyer & Co. *v.* United States (1 Ct. Cust. Appls., 506; T. D. 31531). The articles here in question, as in the cases cited, are articles upon which no further work is necessary to be done to fit them for a specific definite use.

The importer's counsel places great reliance upon the case of Dejonge *v.* Magone (159 U. S., 562). In that case the court had under consideration a paragraph which read:

Paper hangings and paper for screens or fireboards, paper antiquarian, demy, drawing, elephant, foolscap, imperial, letter, note, and all other paper not specially enumerated or provided for in this act. * * *.

It was contended that the importation in question, which had been coated, colored, and embossed to imitate leather, or coated with flock to imitate velvet, was more properly classifiable as manufactures of paper. The court held, however, that it was established by the evidence beyond dispute that at the time of the passage of the tariff act there under consideration fancy papers were largely dealt in in commerce, and were well known in the trade and commerce of the country, and that there were a great variety of fancy papers, and that such designation covered both the importations out of which the controversy arose. It was said:

Nor is it at all probable that Congress would specifically impose a duty of 25 per cent upon paper hangings, and intend that an importation of velvet paper of a similar class to wall paper and used for wall decorations should be assessed as a manufacture of paper at a rate of 15 per cent ad valorem.

While, directly speaking, the products in question might be termed manufactures of the particular variety of paper stock employed as their basis, yet the resultant product of such manufacture was a higher and better grade of paper. There was no such change of form as in the case of paper screens, paper boxes, paper envelopes, and other manufactures of paper. * * *

In the schedule of the tariff act of 1883 under consideration, Congress attempted a classification of paper generally. A duty of 20 per cent was laid upon "paper, sized or glued, suitable only for printing paper"; a duty of 15 per cent was laid upon "printing paper, unsized, used for books and newspapers exclusively"; a duty of 10 per cent was laid upon "sheathing paper"; and all other paper was embraced in the paragraph under which the paper in question was classified and made dutiable at 25 per cent ad valorem. As cheaper grades of paper than the writing and drawing paper enumerated in the paragraph last referred to were elsewhere referred to in the act, it is obvious that the expression "and all other paper not specifically enumerated or provided for in this act" meant precisely what was expressed, and embraced paper of any grade not elsewhere enumerated in the act. * * *

It follows from what has been stated that the court rightly refused the charges requested by plaintiffs in error. It equally follows that if the word "paper" had a well-known signification in trade and commerce in 1883, which embraced these products, that meaning would control.

It will be seen, therefore, that the case really rested upon a proved commercial designation of the importation, and is in that respect distinguishable from the present case.

The decision of the Board of General Appraisers is *affirmed*.