(C.D. 4077)

W. R. FILBIN & Co., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided September 18, 1970)

*William K. Johnson* for the plaintiff.

*William D. Ruckelshaus*, Assistant Attorney General (*Robert T. Richardson, Steven R. Sosnov*, and *Andrew P. Vance*, trial attorneys), for the defendant.

Before RAO, FORD, and NEWMAN, Judges

NEWMAN, Judge: This case concerns the proper rate of duty on certain coils of cold-rolled coated steel imported from Canada and entered in 1967 at the port of Detroit. The merchandise was classified by the Government as "Other" articles of iron or steel, not coated or plated with precious metal, under item 657.20 of the Tariff Schedules of the United States (TSUS); and accordingly the merchandise was assessed with duty at the rate of 19 per centum ad valorem.

Plaintiff claims that the importation is enamel coated sheet steel coils and is properly dutiable at the rate of 0.1 cent per pound plus 8 per centum ad valorem under item 608.87, TSUS.

We sustain the protest.

### STATUTES INVOLVED

Classified under:

SCHEDULE 6.—METALS AND METAL PRODUCTS

PART 3.—METAL PRODUCTS

SUBPART G.—METAL PRODUCTS NOT SPECIALLY PROVIDED FOR

Subpart G headnotes:

1. This subpart covers only articles of metal which are not more specifically provided for elsewhere in the tariff schedules.

 *  *  *  *  *  *  *

Articles of iron or steel, not coated or plated with precious metal:
Cast-iron articles, not alloyed:

\*    \*    \*    \*    \*    \*    \*

Other articles:

\*    \*    \*    \*    \*    \*    \*

657.20      Other _____    19% ad val.

Claimed under:

### SCHEDULE 6.—METALS AND METAL PRODUCTS

### PART 2.—METALS, THEIR ALLOYS, AND THEIR BASIC SHAPES AND FORMS

Part 2 headnotes:

1. This part covers precious metals and base metals (including such metals when they are chemically pure), their alloys, and their so-called basic shapes and forms, and, in addition, covers metal waste and scrap. Unless the context requires otherwise, the provisions of this part apply to the products described by whatever process made (i.e., whether rolled, forged, drawn, extruded, cast or sintered) and whether or not such products have been subjected to treatments to improve the properties or appearance of the metals or to protect them against rusting, corrosion or other deterioration. These treatments include annealing, tempering, case-hardening and similar heat-treatments or nitriding; descaling, pickling, scraping, scalping and other processes to remove oxidation scale and crust; rough coating with oil, tar, grease, red lead, or other material to prevent rusting; polishing, burnishing, glazing, artificial oxidation, phosphatizing, and other finishing treatments; metallization by cementation, by electroplating, by immersion in a bath of molten metal, or by other means; coating with enamel, paint, lacquer, or other non-metallic substances; and cladding. \* \* \*

\*    \*    \*    \*    \*    \*    \*

### SUBPART B.—IRON OR STEEL

Subpart B headnotes:

1. This subpart covers iron and steel, their alloys, and their so-called basic shapes and forms, and in addition covers iron or steel waste and scrap.

\*    \*    \*    \*    \*    \*    \*

Plates and sheets of iron or steel, not cut,
not pressed, and not stamped to non-
rectangular shape (except as provided
in item 609.17) :
    Not coated or plated with metal and
       not clad:
         Black plate:

\*     \*     \*     \*     \*     \*     \*

         Other:

\*     \*     \*     \*     \*     \*     \*

         Pickled or cold rolled:
608.87            Other than alloy iron
               or steel_____ 0.1¢ per lb. plus
                                      8% ad val.

## The Record

Plaintiff called as its sole witness Richard M. Thornton, president of Litho-Strip Corporation, for whose account the merchandise was imported; and introduced in evidence a representative sample of the imported merchandise. Additionally, the official papers were admitted in evidence, and deemed marked.

The Government called no witnesses, and offered no exhibits.

## The Facts

The imported material is cold rolled steel, 0.0197 inch in thickness and 36 inches wide, in the form of coils. If these coils were unrolled, the material would be approximately 10,000 feet in length, and would be in the shape of a long rectangle.

When imported, the steel was coated on one side with three layers of "alkyd" in a walnut grain pattern, while a light brown wash coat was put on the reverse side. Mr. Thornton described the "alkyd" coating as follows (R. 9) :

> \* \* \* "Alykd" come from the first part of "alcohol," the last part of "acid." It's a coating which is produced by a—with a resin which is manufactured by using a fatty acid drying oil with a thallic anhydride, which is the alcohol-type material. Also includes pigments to give it its color. On the one side it's a walnut wood grain pattern or print coating. On the reverse side it's a light brown wash coat of the same type of material without a pattern.

The three coats of alkyd are applied to the sheets, by means of a continuous process, in the following manner: After several preliminary operations to prepare the steel for coating, a roll coater applies the base coat of light brown color. The steel then goes through a heat setting operation where the base coat is set to the point where the subsequent coating can be applied. Thereupon, the material is cooled by water quenching. The steel then goes through the second coater

that applies the print coat and gives it the wood grain effect. Less than one second after the application of the print coat, a clear coating of a similar nature is applied on a different head of the coater. At the same time, the back side coating (brown wash coat) is applied. Hence, the three coats of alkyd (base coat, wood grain pattern, and clear top coat) are the same composition, except the clear top coat does not have a pigment, and the other two coats have different pigmentation.

After the sheets have received the three coats of alkyd, the material is cured to the required hardness and fabrication specifications. The steel is then water quenched, and finally it is rewound in coil form.

The alkyd coating prevents the moisture and corrosive elements in the air from coming in contact with the steel. Thornton emphasized that the three layers of alkyd seal the metal better for corrosive resistance than would one layer of the same thickness. Thus, Mr. Thornton explained (R. 14–15) :

> Q. What if any improvement in the properties of the product or the material are achieved by the application of three layers of the alkyd as compared with the application of a single layer of the same thickness?—A. Well, essentially, any coating which is applied unless it's an infinite thickness, has some pin holes in it. If you apply one coat of a specific thickness in comparison to three coats these pin holes will still go down to the metal. If you apply one thin coat it has pin holes. You put another thin coat on top of it and what happens is that somewhat like laying screens one on top of the other and not aligning the holes, some part of the screen will cover the other holes. And by adding multiple coats you then block off these holes to a greater extent the more coats you apply.

Moreover, the uncoated metal is dark and dull, whereas the wood grain effect provides an "esthetic effect." The addition of the alkyd coating, "provides a color which is * * * much more pleasing than the base cold-rolled steel and it also provides a pattern which is esthetically pleasing" (R. 14).

The coils of steel have no uses or applications without further processing, i.e., cutting, slitting to size, bending, shaping, perforating, etc. After processing it is used for various applications, such as shelving, dehumidifier covers, air conditioner covers, automotive trim, ashtrays, wall paneling, strips for suspending accoustical tile, trim on refrigerators and furniture, decorative trim in stores, pole lamps, snack trays, legs for TV trays, tubes for closet poles, and many others.

Other than increased corrosion protection and apart from any decorative preference that a designer may have, there does not appear to be any application for which the imported material is suitable and a plain color material is unsuitable, or vice versa. Further, from a physical standpoint there is no difference in the processing steps or

procedures to which the imported material can be subjected, as compared to that which a solid-color coated steel can be subjected.

The parties have stipulated that the merchandise consists of coils of cold-rolled steel, not coated or plated with metal, and not clad; that the merchandise had been coated with enamel; and that the merchandise is not alloy iron or alloy steel (R. 4, 24).

## THE ISSUE

Item 657.20, TSUS, under which the merchandise was classified by the customs officials, "covers only articles of metal which are not more specifically provided for elsewhere in the tariff schedules." Headnote 1, subpart G, part 3, schedule 6, TSUS. Thus, the issue presented is whether the imported merchandise is a steel sheet, and as such, more specifically provided for in item 608.87 than in item 657.20.

## STEEL SHEETS—EFFECT OF WOOD GRAIN COATING ON CLASSIFICATION UNDER ITEM 608.87

It is not disputed that the imported merchandise meets the following requirements for classification under item 608.87: it is cold-rolled steel sheets [1] not cut, pressed, or stamped to nonrectangular shape; not coated or plated with metal; not clad; not black plate; [2] and not alloy steel. Defendant, however, insists that the merchandise "due to its alkyd wood-grained finish was properly classified as an article of iron or steel." Hence, we must consider whether the presence of the wood grain coating on the metal means that the imported merchandise is precluded from classification as steel sheets, and therefore was properly classified by the Government under the "basket" provision for articles of iron or steel in item 657.20.

In headnote 1, part 2, schedule 6, Congress manifested its intent that the provisions of part 2 be applicable to the products described "whether or not such products have been subjected to treatments to improve the properties or appearance of the metals or to protect them against rusting, corrosion or other deterioration." Specifically permitted by the headnote is "coating with enamel, paint, lacquer, or other non-metallic substances." The parties have stipulated that the merchandise is coated with enamel (R. 4). Additionally, the record is clear that the purposes of the alkyd coating are to protect the metal against rusting and corrosion, and to improve its appearance. Further,

---

[1] Headnote 3(g), subpart B, part 2, schedule 6 defines "sheets" as: "[F]lat rolled products whether or not corrugated or crimped, in coils or cut to length, under 0.1875 inch in thickness and over 12 inches in width." The imported steel was 0.0197 inch in thickness, 36 inches in width, and in coils.

[2] Headnote 3(g)(i), subpart B, part 2, schedule 6 states: "[T]he term 'black plate' refers to cold rolled steel sheets, not coated, under 0.0142 inch in thickness."

alkyd's protective function is evident from the following definition set forth in *Webster's Third New International Dictionary* (1961):

> Alkyd or alkyd resin * * * [blend of *alkyl* and *acid*]: any of a large group of thermoplastic or thermosetting synthetic resins that are essentially polyesters made by heating polyhydric alcohols (as glycerol, ethylene, glycol or pentaerythritol) with polybasic acids or their anhydrides (as phthalic anhydride, maleic anhydride, or sebacic acid) and *used chiefly in making protective coatings* characterized in general by their gloss, flexibility, and good weathering properties. [Emphasis added in part.]

It therefore appears, in light of headnote 1, *supra*, that plaintiff has made a *prima facie* case for classification of the imported merchandise as a steel sheet within the purview of item 608.87.

In support of its position, defendant called attention to several decisions construing provisions under prior tariff acts, holding that steel sheets which have been advanced in condition for particular commercial uses are not classifiable as steel sheets, but as articles of steel wholly or partly manufactured: *Braun-Steeple Co. et al.* v. *United States*, 18 CCPA 437, T.D. 44683 (1931), involving 3' x 6' steel sheets stamped or perforated with fancy designs, cut to shape and form after importation for uses in radiator covers, panels in the ends of metal beds, lanterns, lighting fixtures, fire screens, etc.; *R. W. Smith, a/c Goodson Steel Corp.* v. *United States*, 60 Cust. Ct. 535, C.D. 3452, 284 F. Supp. 777 (1968), involving metal lath processed from steel sheets by slitting, pressing, and expanding operations, and coated with black asphalt to prevent rust; mainly used in the construction industry as a plaster base; so changed or advanced in condition that the merchandise had attained a distinctive name, character and use, different from that originally possessed by the material before being subjected to the manufacturing process.

The rationale of the two above cited cases was recently applied by this court in *Burn Strauss, Inc.* v. *United States*, 62 Cust. Ct. 664, C.D. 3845, 305 F. Supp. 14 (1969), which involved painted steel sheets, corrugated along the width, and dedicated for use as parts of wading pools by having a hem along the length and holes punched and dimpled along the short edges. Such merchandise was held properly classified by the Government under item 657.20, TSUS, as "Other" articles of iron or steel, rather than under the provisions for steel sheets in items 608.81 and 608.82, TSUS, as claimed by plaintiff.

However, these three decisions are inapposite to the present case, inasmuch as the issues there did not concern coating with paint, enamel, lacquer, etc.

A decision somewhat more in point is *United States* v. *Globe Shipping Co., Inc.*, 31 CCPA 95, C.A.D. 254 (1943), arising under the Tariff Act of 1930. In *Globe*, the imported merchandise was described on the invoice as "Cold rolled Steel Sheets lacquered one side, one colour." The appellate court affirmed this court's holding that such merchandise was properly dutiable as steel sheets under paragraph 304 rather than as manufactures of metal not specially provided for under paragraph 397. The gist of the Government's contention was that the sheets "have been advanced in condition by lacquering to such an extent that they are manufactures of metal, rather than steel sheets." With reference to such contention, the court commented (31 CCPA at 96–97):

> * * * It is true that the testimony respecting the eventual or ultimate use of the sheets is not very elaborate. The witnesses called by the Government were not questioned and gave no testimony upon this point. The fair purport of the testimony of importer's witness, Geisler, we think, is that they are used in the manufacture of various articles * * *. We think, however, that this is a case in which the sample in evidence is a potent witness, and it appears clear to us that various types of articles can be stamped or manufactured from the sheets. Upon the record, taken as a whole, we think it should be held that the sheets in their condition as imported had not been so advanced in manufacture that they had become dedicated to any single use, or class of uses, which is one of the tests applied in determining whether an article contemplated by paragraph 397, *supra*, is "partly or wholly manufactured."

The appellate court also emphasized in *Globe* that it did not regard the process of applying the lacquer of any importance, and concluded that the resulting product was a steel sheet coated on one side.

Although here, the coating is on both sides of the sheet and gives the metal a wood grain appearance on one side, nevertheless *Globe* is persuasive in finding that the instant merchandise has not been advanced beyond the form of sheets. Notwithstanding the alkyd coating, the instant merchandise has retained its character and use as steel sheets and still remains a material for the making of various articles, such as automotive trim, ashtrays, shelving, air conditioning covers, and many others. Cf. *J. C. De Jong & Co., Inc.* v. *United States*, 62 Cust. Ct. 605, C.D. 3832 (1969). The fact that the merchandise may be limited in use to the extent of decorators' or designers' color preferences, does not alter its nature as a mere material available for a variety of end uses.

In sum, coupling the rationale of *Globe* and the plain meaning of headnote 1, part 2, schedule 6, we find under all of the facts and circumstances herein that the imported merchandise is a basic shape or form and is classifiable as steel sheets within the purview of item 608.87, TSUS.

The protest is sustained, and judgment will be entered accordingly.