(C.D. 4554)

W. R. Filbin & Co., Inc.,
John V. Carr & Son, Inc.,
and Litho-Strip Corporation,
a division of Amsted Industries,
Inc. v. United States

---

Court Nos. 68/47804, etc.

(Decided July 29, 1974)

*Lord, Bissell & Brook* (*William K. Johnson* of counsel) for the plaintiffs.
*Carla A. Hills*, Assistant Attorney General (*Martin L. Rothstein* and *Saul Davis*, trial attorneys), for the defendant.

MALETZ, Judge: These 68 consolidated actions involve the proper tariff classification of certain enamel coated coils of cold rolled and galvanized steel that were imported from Canada and entered at the port of Detroit. The imports were classified by the government under item 657.20 of the tariff schedules as "Other" articles of iron or steel, not coated or plated with precious metal, and assessed duty at the rate of 19% ad valorem.

Plaintiffs claim that this assessment was erroneous and that the importations are properly classifiable as steel sheets, with the cold rolled steel coils dutiable at the rate of 0.1 cent per pound plus 8%

under item 608.87 and the galvanized steel coils dutiable at the same rate under item 608.95.

STATUTES INVOLVED

Classified under:

SCHEDULE 6. – METALS AND METAL PRODUCTS

PART 3. – METAL PRODUCTS

Subpart G. – Metal Products Not Specially Provided For

Subpart G headnotes:

1. This subpart covers only articles of metal which are not more specifically provided for elsewhere in the tariff schedules.

\* \* \* \* \* \* \*

Articles of iron or steel, not coated or plated with precious metal:

\* \* \* \* \* \* \*

Other articles:

\* \* \* \* \* \* \*

657.20          Other _____ 19% ad val.

Claimed under:

SCHEDULE 6. – METALS AND METAL PRODUCTS

PART 2. – METALS, THEIR ALLOYS, AND THEIR BASIC SHAPES AND FORMS

Part 2 headnotes:

1. This part covers precious metals and base metals (including such metals when they are chemically pure), their alloys, and their so-called basic shapes and forms, and, in addition, covers metal waste and scrap. Unless the context requires otherwise, the provisions of this part apply to the products described by whatever process made (i.e., whether rolled, forged, drawn, extruded, cast or sintered) and whether or not such products have been subjected to treatments to improve the properties or appearance of the metals or to protect them against rusting, corrosion or other deterioration. These treatments include annealing, tempering, case-hardening and similar heat-treatments or nitriding; descaling, pickling, scraping,

scalping and other processes to remove oxidation scale and crust; rough coating with oil, tar, grease, red lead, or other material to prevent rusting; polishing, burnishing, glazing, artificial oxidation, phosphatizing, and other finishing treatments; metallization by cementation, by electroplating, by immersion in a bath of molten metal, or by other means; coating with enamel, paint, lacquer, or other non-metallic substances; and cladding. * * *

\* \* \* \* \* \* \*

### Subpart B.—Iron or Steel

Subpart B headnotes:

1. This subpart covers iron and steel, their alloys, and their so-called basic shapes and forms, and in addition covers iron or steel waste and scrap.

\* \* \* \* \* \* \*

Plates and sheets of iron or steel, not cut, not pressed, and not stamped to non-rectangular shape (except as provided in item 609.17):
    Not coated or plated with metal and not clad:

\* \* \* \* \* \* \*

    Other:

\* \* \* \* \* \* \*

        Pickled or cold rolled:

| | | |
|---|---|---|
| 608.87 | Other than alloy iron or steel _____ | 0.1¢ per lb. +8% ad val. |

\* \* \* \* \* \* \*

    Coated or plated with metal:

\* \* \* \* \* \* \*

      Other:

| | | |
|---|---|---|
| 608.95 | Other than alloy iron or steel _____ | 0.1¢ per lb. +8% ad val. |

### I

As previously set forth, item 567.20—under which the imported merchandise was classified by the government—"covers only articles of metal which are not more specifically provided for elsewhere in the tariff schedules." See headnote 1, Subpart G, Part 3 of Schedule 6. Thus, the issue presented is whether the importations are steel sheets

in their basic shape and form, coated in accordance with headnote 1, Part 2 of Schedule 6 (hereafter referred to as "headnote 1"), and as such, more specifically provided for in items 608.87 and 608.95 than in item 657.20.

It is to be observed that a like issue was involved in *W. R. Filbin & Co., Inc.* v. *United States*, 65 Cust. Ct. 194, C.D. 4077 (1970) (hereafter referred to as "*Filbin* I") where this court sustained the importer's protest and held that merchandise similar and in some cases identical to the merchandise in question here was properly classifiable under item 608.87 as steel sheet rather than under item 657.20 as "Other" articles of iron or steel. Thus, the present case is in effect a retrial of *Filbin* I.

## II

We consider first the facts as established by the record.[1] At the outset, the parties stipulated (i) that the imported merchandise consisted of coils of cold rolled steel sheets not clad and not coated with metal except for the hot dipped galvanized material; and (ii) that the steel sheets were coated with enamel. Beyond that, the record showed that if the coils were unrolled, the coated metal sheets would be in the shape of a long rectangle, 3,000 to 10,000 feet in length, 22¾ to 44 inches in width and 0.015 to 0.0295 inch in thickness.

Prior to importation, the steel was coated on the topside with non-metallic enamel which produced plain colors, stripes, or simulated wood grain patterns. On the bottom or backside, the steel was coated with solid colors (i.e., a full coat with no pattern) ; or with washcoat (i.e., a pigmented material which is less than a full coat) ; or with clear coats of unpigmented materials. In some instances, the backside was not coated or painted. It is to be added that the present imports were coated for the same importer, by the same coater, and on the same equipment, as the material in *Filbin* I.

The enamel coatings were applied to the steel sheets by means of a continuous process. After several preliminary operations to prepare the steel for coating, a roll coater applied the basic coat. In some cases, a backside coating was also applied as part of the same operation. The steel then went through a heat setting operation to prepare the surface of the base coat so that it would be suitable for further enamel coats. Thereupon, the material was subject to a water cooling cycle. The steel then went through a second coating operation, where the pattern or stripe, if any, was applied. In the case of the wood grain pattern, a

---

[1] Plaintiffs called two witnesses, the secretary-treasurer of plaintiff Litho-Strip Corporation, the actual importer, and a management and engineering consultant, who had formerly been president of Litho-Strip. Defendant called two witnesses employed by the United States Steel Corporation (hereafter referred to as "U.S. Steel"), who testified as experts. Further, plaintiffs introduced eight exhibits, while defendant introduced six.

clear top coat was also applied at that stage together with (in some instances) a coating to the backside. After the sheets received the designated coatings, they went through another heat setting operation where the coatings were cured to the required hardness and fabrication specifications. The steel was then water quenched, and finally rewound in coil form.

The wood grain pattern—which was applied in the second coating operation—was obtained by means of a gravure cylinder that picked up and retained ink in the indentations in the cylinder.[2] The striped pattern was produced by transferring ink or enamel from a solid metal roll to a rubber roll which was cut to the width of the stripe and in turn applied to the sheet. In some cases, the stripe was applied in gravure fashion.

It is to be noted that the steel with the wood grain pattern had three coats applied; the cold rolled striped patterns, two coats; and the hot dipped galvanized striped pattern, one, two, or three coats.

At no time prior to the completion of the production cycle was the material, in its then present form and condition, suitable for any commercial use. For example, the material emerging from the first heat treating operation was in no condition to be utilized since it was not sufficiently cured and lacked the properties required for an end use. What is more, even after the coating operation was completed, the coiled sheets, in their condition as imported, were not commercially usable without further processing. Thus, the sheets had to be sheared, perforated, bent, formed and/or stamped before they were suitable for use in any product.

The coatings applied to the steel sheets were all described as "enamels" within the general usage in the paint industry. More particularly, the wood grain sheets were coated with an alkyd coating —an alkyd being a combination of an alcohol and an acid. The cold rolled striped sheets were coated with a polyvinyl chloride, while the hot dipped galvanized sheets were coated with a silicon alkyd. All the coatings were nonmetallic.

The purposes of the coatings were to provide corrosion protection to the underlying steel sheet and to enhance the appearance of the sheet. The improvement in appearance resulted from changing the dull dark color of cold rolled steel, or the silvery spangled appearance of galvanized, to more attractive colors.

In those instances where multiple coatings were applied there were advantages, in relation to appearance and corrosion protection, to

---

[2] The gravure cylinder was manufactured in the following way: First a pattern was produced either by an artist or by photographic means, and the pattern was then transferred by photographic means to the roll. Various coatings were applied to the roll and then removed in a controlled fashion. The roll was then etched so that there were small cells in the surface of the roll which conformed to the pattern which was put on the roll.

62

the multiple coats as distinguished from a single coating of the same thickness. In the first place, the variation in color that was achieved by the wood grain and striped patterns was generally more pleasing in appearance than solid color materials. Secondly, the additional coats provided greater corrosion protection. In the latter connection, any coating applied to metal and heat treated in the manner that was done here, was susceptible to pinholes. These pinholes provided focal points for corrosion. Therefore, the application of a second coat, even though it had pinholes, acted like putting two screens together, where the wire in one screen covers the holes in the other. For this reason, several thin coats provided better corrosion protection than one thick coat of equivalent thickness. Generally speaking, also, the thicker the coating the better the corrosion protection.[3]

After completion of the coating operation described above, no further processing occurred. At the time of importation, there was no other coating on the material, except the galvanized coating on the galvanized steel. Also at the time of importation, none of the imported material had been cut, pressed or stamped to non-rectangular shape. And except for the hot dipped galvanized material—which was neither tin or terne coated—none of the steel was either coated or plated with any metal. Nor was any of the material alloy steel or clad.

In its imported condition, either in coiled form, or flat as a long rectangle, the imported material (as set out previously) had no commercial use without further processing. It was, however, susceptible to being sheared, perforated, bent, formed and/or stamped, or all these operations, into its final end product. It was also susceptible to being welded through generally accepted techniques.

With such additional processing, the imported merchandise was suitable for a wide variety of end use applications. Thus, the imported merchandise in question here was ultimately used for automotive parts, shelving, building panels and accessories, baseboard heaters, and picture frames. Further, if the steel itself was suitable, the imported coated sheets were also suitable for the manufacture of acoustical tile and suspension systems, building panels, gutters, downspouts, closures, buttons, curtain rods, metal baseboards, oil filters, picture frames, stampings, dashboards, appliances, metal furniture, mobile homes, signs, serving trays, decorative tiling, advertising specialties, lock seam tubing, doors, ballast caps, lighting fixtures, ammunition cases, shelving, etc.

In some cases, the type of steel used and the coating applied were custom-made in accordance with the customer's specifications for a

---

[3] The weight of the evidence established that at the time of the importations, there were in regular commercial use, coatings which equalled or surpassed the formability of the underlying steel. See e.g., plaintiffs' exhibit 8.

particular end use.; frequently, however, the same material and coating were used for a large number of customers. On this latter aspect, about eleven types of coating were available and the actual type utilized depended on the end use of the product. For instance, an alkyd finish is a low cost coating material which is quite acid, alkyne resistant, hard and non-ductile. Hence, it is not suitable for products such as closures, stampings and lock seam tubing which are produced by severe forming operations. On the other hand, it is suitable and used for such products as appliances, baseboard heating units, shelving, etc.

Silicon alkyd coating has the same limitations as alkyd with the exception that it can be used for outdoor exposure. However, since it costs much more than alkyd coating, it was recommended only for outdoor use.

Polyvinyl coating is suitable for products which require severe forming, but is not particularly suitable for outdoor exposure applications. By contrast, polyvinyl chloride coating is suitable for all the products previously mentioned, though its outdoor exposure properties are not as good as those of silicon alkyd.

On a related phase, those importations which were coated with silicon alkyd were guaranteed for a period of three years against weathering, cracking, peeling or fading. Also in a few cases, guarantees were custom written to meet a particular situation or a particular use that was going to be made of the coated steel; otherwise outdoor use was the only end use that was guaranteed. Additionally, there were product specification guarantees regarding such things as color, film thickness, etc.

Beyond these considerations, the record further showed that during the period in issue, U.S. Steel sold coated steel sheets similar to the solid and wood grain coated sheets involved here but did not handle anything comparable to the imported striped sheets. Thus it sold large amounts of prepainted (coated) hot dipped galvanized sheets to: the preengineering building market; fluorescent lighting fixture manufacturers; appliance manufacturers; swimming pool manufacturers; etc. The coated sheets handled by U.S. Steel were sold only on a custommade basis in accordance with customer specifications. These specifications involved the degree of corrosion resistance; the thickness of the coating on each side of the sheet; gloss and color requirements; degree of reflectivity in lighting fixture applications; and degree of resistance to foodstains when the sheets were used for freezer or refrigerators linings.

Since coated steel sheets were only sold by U.S. Steel on a custommade basis, its prices for such sheets were not determined until the customer's specifications were submitted. Further, the sheets were sold by U.S. Steel under several types of written guarantees that related directly to the end use of the product. By contrast, U.S. Steel

published a price list for unpainted steel and sold such steel without any written guarantee.

In many instances, coated sheets of U.S. Steel that were made to one manufacturer's specifications were not suitable for use by another manufacturer. As an example, a sheet that was coated to a specification for a building panel was not necessarily suitable for the inside of a freezer or refrigerator liner.

Additionally, one of the government witnesses, who was familiar with the coating operations used in producing the striped and wood grain patterns here in issue, testified that these operations were much more sophisticated than the conventional coil coating operation. Further, according to this witness, the process used to apply the wood grain pattern was a form of lithography, while the striped pattern was applied by a specialized printing operation.

Finally, reference in the record was made to the American Iron and Steel Institute, whose primary function is to establish standards for steel products. That organization publishes a *Steel Products Manual* which is universally accepted in the steel industry and contains standards for carbon sheet steel, either in the form of coils or cut to size. The Manual covers all standard sheet products including cold rolled and hot dipped galvanized steel that has not been patterned or imprinted. However, it does not include prepainted sheets of steel.

## III

Against this background, it must be concluded that the underlying steel sheets met all the criteria applicable to classification of cold rolled steel sheets under item 608.87 and of galvanized sheets under item 608.95. For one thing, as required by headnote 3(g), Subpart B, Part 2 of Schedule 6, the sheets were under 0.1875 inch in thickness and over 12 inches in width; [4] also the sheets were more than 0.0142 inch in thickness and thus were not "black plate" as defined in headnote 3(g)(i) of Subpart B, Part 2 of Schedule 6.[5] The sheets were not cut, pressed or stamped into non-rectangular shape. None of the material was clad, nor was it alloy steel. The cold rolled sheets had not been coated or plated with any metal, while the hot dipped galvanized sheets were neither tin coated nor terne coated.[6]

As we have seen, the further statutory criteria for determining whether a coated steel sheet is entitled to classification under Part 2

---

[4] Headnote 3(g), Subpart B, Part 2, Schedule 6 defines "Sheets" as: "[F]lat rolled products whether or not corrugated or crimped, in coils or cut to length, under 0.1875 inch in thickness and over 12 inches in width."

[5] Headnote 3(g)(i), Subpart B, Part 2, Schedule 6 states that "the term *'black plate'* refers to cold rolled steel sheets, not coated, under 0.0142 inch in thickness."

[6] Items 608.92 and 608.93 cover tin coated and terne coated sheets, respectively. The term "terne coated sheets" refers to steel sheets coated with terne metal (a lead-tin alloy)." See headnote 3(g)(iii), Subpart B, Part 2, Schedule 6.

of Schedule 6 is manifested by headnote 1 thereof, which (as previously noted) provides in part as follows:

> \* \* \* Unless the context requires otherwise, the provisions of this part apply to the products described \* \* \* whether or not such products have been subjected to treatments to improve the properties or appearance of the metals or to protect them against rusting, corrosion or other deterioration. These treatments include \* \* \* coating with enamel, paint, lacquer or other non-metallic substances; \* \* \*.

The parties have stipulated that the imported steel sheets had, at the time of importation, been coated with enamel, and the evidence established that except for the galvanized coating on the galvanized steel, the imported sheets contained no coating other than enamel coating. The evidence further established that the coatings were applied to protect against corrosion and to improve the appearance of the imported sheets. In short, the evidence established that all of the statutory criteria for the enamel coatings, provided by the applicable headnote, were fully met in the present case.

With these considerations in mind, it is apparent that the essential issue here has previously been disposed of by this court in *Filbin* I, *supra*, 65 Cust. Ct. 194. That case involved the proper tariff classification of coils of cold rolled steel sheet coated with alkyd on both sides, and simulating the appearance of wood on one side. As in the present case, the government in *Filbin* I classified the imports under item 657.20 as "Other" articles of iron or steel, while plaintiff claimed the merchandise was a steel sheet coated with enamel, and pursuant to headnote 1, properly classifiable under item 608.87. The court sustained the protest holding that in light of headnote 1, plaintiff had made a prima facie case for classification of the imported merchandise as a steel sheet within the purview of item 608.87. In reaching this result, the court relied heavily on *United States* v. *Globe Shipping Co., Inc.*, 31 CCPA 95, C.A.D. 254 (1943) which arose under the Tariff Act of 1930. In *Globe*, the imported merchandise was described on the invoice as "Cold rolled Steel Sheets lacquered one side, one colour." The appellate court affirmed this court's holding that such merchandise was properly dutiable as steel sheets under paragraph 304 rather than as manufactures of metal not specially provided for under paragraph 397. The gist of the government's contention in *Globe* was that the sheets "have been advanced in condition by lacquering to such an extent that they are manufactures of metal, rather than steel sheets." As to that contention, the court commented (31 CCPA at 96–97):

> \* \* \* The fair purport of the testimony of importer's witness, Geisler, we think, is that \* \* \* [the sheets] are used in the

manufacture of various articles * * *. We think, however, that this is a case in which the sample in evidence is a potent witness, and it appears clear to us that various types of articles can be stamped or manufactured from the sheets. *Upon the record, taken as a whole, we think it should be held that the sheets in their condition as imported had not been so advanced in manufacture that they had become dedicated to any single use, or class of uses, which is one of the tests applied in determining whether an article contemplated by paragraph 397, supra, is "partly or wholly manufactured."* [Emphasis added.]

Not only is the rationale of *Globe* applicable here, this court is in entire agreement with the following apt comments of Judge Newman with respect thereto in *Filbin* I (65 Cust. Ct. at 201) :

Although here, the coating is on both sides of the sheet and gives the metal a wood grain appearance on one side, nevertheless *Globe* is persuasive in finding that the instant merchandise has not been advanced beyond the form of sheets. Notwithstanding the alkyd coating, the instant merchandise has retained its character and use as steel sheets and still remains a material for the making of various articles, such as automotive trim, ashtrays, shelving, air conditioning covers, and many others. Cf. *J. C. De Jong & Co., Inc.* v. *United States*, 62 Cust. Ct. 605, C.D. 3832 (1969). The fact that the merchandise may be limited in use to the extent of decorators' or designers' color preferences, does not alter its nature as a mere material available for a variety of end uses.

In sum, coupling the rationale of *Globe* and the plain meaning of headnote 1, part 2, schedule 6, we find under all of the facts and circumstances herein that the imported merchandise is a basic shape or form and is classifiable as steel sheets within the purview of item 608.87, TSUS.

It is to be noted that much of the material involved in the present case was the same plain alkyd coated, simulated wood grain, cold rolled steel involved in *Filbin* I. Further, the present material involved coatings applied as either stripes or plain colors. These, it is apparent, are covered by an *a fortiori* application of the *Filbin* I holding. It is quite true that in the present case the coatings were silicon alkyd and polyvinyl chloride, in addition to the plain alkyd coating involved in *Filbin* I. But all these coatings were properly described as "enamels" as that term was generally used in the industry and as stipulated by the parties. Thus all fall within headnote 1, which allows "coating with enamel" as a specifically recognized process.

Next, some of the imported coils in issue here had galvanized steel as the substrate instead of cold rolled steel. However, headnote 1 is equally applicable to galvanized steel, as it is applicable to the cold rolled steel involved in *Filbin* I and in the present case.

Thus, while there are minor differences between some of the imports here involved and those involved in *Filbin* I, none of those differences are such as to call for a different result.

Moreover, the record in the present case demonstrated that as in *Filbin* I, "the instant merchandise has retained its character and use as steel sheets and still remains a material for the making of various articles, * * *." Thus here the imported material only acquired commercial utility after it was sheared, perforated, bent, formed and/or stamped into its final end product. As previously noted, the imported material here was, in fact, ultimately manufactured into automotive parts, shelving, building panels and accessories, baseboard heaters, and picture frames. Beyond that, as discussed before, if the steel itself was suitable, the imported coated sheets were also suitable for the manufacture of a wide variety of diverse products.

In short, the evidence in the present case established that as in *Filbin* I, the imported merchandise "has retained its character and use as steel sheets and still remains a material for the making of various articles, * * *."

Defendant argues, however, that the imported products, "[d]ue to their unique finish and the unique process utilized to apply to unique finish, were properly classified as an article of iron or steel." (Br. p. 18).[7] But uniqueness is not the test for determining whether an item is a sheet of iron or steel in its basic shape or form as distinguished from a metal product; rather the test was set forth by this court in *Burn Strauss, Inc.* v. *United States*, 62 Cust. Ct. 664, 668, C.D. 3845, 305 F. Supp. 14, 18 (1969), as follows:

> In our opinion, the provisions in subpart B, part 2, schedule 6 for sheets of iron or steel were intended to cover *material for manufacturing articles*, as distinct from *finished articles of manufacture ready for use*. This conclusion is fully supported by the cases. [Emphasis added.]

In *Burn Strauss* the court held that an imported article was no longer a steel sheet, but was in fact a finished article of manufacture, ready for use, where steel sheet had been cut to the size required for use as a wall for a wading pool, hemmed along the edges for horizontal stability and as a precaution against accidental cutting by the ultimate user, corrugated to give vertical rigidity as a wading pool wall, stamped with dimpled holes along both ends to allow joining into a wading pool, and nothing remained to be done to make a wading pool except to assemble it, together with a plastic liner.

In reaching this conclusion, the court in *Burn Strauss* relied on a number of cases, including *United States* v. *Frank*, 15 Ct. Cust. Appls.

---

[7] To this contention, defendant adds: "There is primarily one determination that must be made in this action. Are these products—which started out in Canada as unfinished bare pieces of sheet metal which had at least two coats of paint or enamel applied, and in most instances four coats of paint or enamel (i.e., the woodgrain pattern), generally, by a sophisticated process—so far advanced as to preclude them from classification under any item other than 657.20, *i.e.*, articles of iron or steel?" (Br. p. 18).

68

97, T.D. 42184 (1927) and *Stengel* v. *United States*, 2 Ct. Cust. Appls. 137, T.D. 31663 (1911). In *Frank* the court held that paragraph 304 of the Tariff Act of 1922—which covered sheets and plates—"was intended to refer to materials for further manufacturing processes and not to completely manufactured products like the steel piling involved here." 15 Ct. Cust. Appls. at 102. In *Stengel*, zinc in the form and shape of, and ready for use in its imported condition as, tiles or tiling for walls and ceilings, was held to be classifiable under the provision in the Tariff Act of 1909 for articles of zinc rather than under the provision for zinc in sheets. The latter provision was held to cover "sheets of zinc which retained their form and identity as such and were intended to be used as material for manufacturing articles as distinct from articles of manufacture ready for use." 2 Ct. Cust. Appls. at 138. The court emphasized (*Id.* at 139) that "[t]he articles here in question * * * are articles upon which no further work is necessary to be done to fit them for a specific definite use."

Also worthy of note are the following additional comments in *Burn Strauss* (62 Cust. Ct. at 669) :

> * * * [I]t has been held that where steel sheets have been advanced in condition for particular commercial uses, they are not classifiable as steel sheets, but as articles of steel not specially provided for. *Braun-Steeple Co. et al.* v. *United States*, 18 CCPA 437, T.D. 44683 (1931) (steel sheets stamped with fancy designs for use in radiator covers, panels in the ends of metal beds, lanterns, etc.) ; *R. W. Smith, a/c Goodson Steel Corp.* v. *United States*, 60 Cust. Ct. 535, C.D. 3452, 284 F. Supp. 777 (1968) (metal lath processed from steel sheets by slitting, pressing and expanding operations, used mainly in the construction industry as a plaster base).

Finally, the court in *Burn Strauss* distinguished *United States* v. *Globe Shipping Co., Inc., supra*, 31 CCPA 95 on the following basis (62 Cust. Ct. at 671) :

> * * * While the process of lacquering the sheets in *Globe* did not remove them from their status as a *material* from which "various types of articles can be stamped or manufactured," we are clear that the articles in the present case were advanced in condition for a particular commercial use, and were not "used in the manufacture of various articles." * * * [Emphasis in original.]

Under all of these cases, taken together, classification as a metal product was sustained only where the sheet of metal was processed beyond the basic sheet form produced in the steel mill. For example, in *Burn Strauss, Inc.* v. *United States, supra*, such a steel sheet was, prior to importation, cut, hemmed, punched and dimpled. In *Braun-Steeple Co.* v. *United States, supra*, the sheet was stamped with perforations forming various fancy designs and thus advanced in condi-

tion for particular commercial uses.[8] On the other hand, in *United States* v. *Globe Shipping Co.*, *supra*, the steel was in its basic sheet form and classification as a steel sheet was allowed, even though coated and even though there was no statutory provision granting specific recognition to such coating, as in the case here.

On that line of distinction, the instant steel was not properly classified under item 657.20 as an article of iron or steel. All of the instant imported steel was still in the form of sheet steel in coils. Unrolled it was in the form of a long rectangle, with a length of between 3,000 and 10,000 feet and a width of between 22¾ to 44 inches. That is the form and shape in which the steel had been manufactured in the steel mill. To be commercially useful, it had to be subjected to the further manufacturing processes of shearing, perforating, bending, forming and/or stamping. And after such processing, enamel coated steel of this type was used for a host of manufactured articles. The short of the matter is that the evidence established beyond doubt that the imported enamel coated steel is a material for manufacturing articles.

Defendant contends, however, that the imported steel sheet was imprinted with enamel through a sophisticated printing process and that the sheet therefore was so far advanced as to be dedicated toward a class of uses and hence classifiable as an article of iron or steel. This argument is quite without merit.

The fact, about which there is no question, is that a metal cylinder picks up the correct amount of enamel and deposits it on a rubber roller which transfers it to the steel. The striped pattern is produced by cutting the roller. The wood grain is produced by applying a second coat of the same material but a different color, selectively, on top of the first coat after the first coat has been partially heat set but before the final baking process sets all coats.

If defendant is urging that this process cannot properly be called coating with enamel, such an argument would be in direct contraven-

---

[8] In *Braun-Steeple*, it appears that as imported the perforated sheet was ready for immediate use needing only to be cut to shape and form. 18 CCPA at 438. It is to be noted that the court in *Braun-Steeple* affirmed the decision of this court in *Frank P. Dow Co., Inc.* v. *United States*, 58 Treas. Dec. 1007, Abstract 13317 (1930). In *Dow*, the court's opinion stated merely that "[o]n the authority of Braun v. United States (T.D. 44191) the protest was overruled." In *Braun*, 58 Treas. Dec. 128, T.D. 44191 (1930), the case thus referred to in *Dow*, the court held that imported perforated sheets were properly classified as manufactures of steel rather than as steel not specially provided for. In reaching this result, the court stated that the imported material "would scarcely be deemed to be merely steel material, particularly as it is ready for immediate use as imported, requiring only to be cut to proper size." 58 Treas. Dec. at 129. The court in *Braun* further stated that such cutting did not constitute a manufacturing process but at best merely served to fit or adjust the perforated article to its ultimate and destined use as part of a completed whole. The court then concluded that "[s]trictly speaking, these perforated sheets are not to be manufactured into different articles or shapes, but are merely to be cut so as to render them susceptible of immediate use as part of a given article. As imported, they require nothing to be done in the way of further fabrication or manufacture to fit them for their ultimate use save cutting to size, * * *." 58 Treas. Dec. at 130. See also *J. G. Brown* v. *United States*, 55 Treas. Dec. 268, T.D. 43209 (1929).

tion of the stipulation of its trial counsel made in open court at the commencement of the trial that the metal sheet was coated with enamel (Tr. 10–11). In view of this stipulation, there is no further issue on this point, since "coating with enamel" is a process recognized by headnote 1.

But even assuming arguendo that the process used on the imported steel was not coating, Part 2 of Schedule 6 would still be applicable. For headnote 1 refers to metals in their basic shape or form "by whatever process made * * * and whether or not such products have been subjected to *treatments* to improve the properties or appearance of the metals or to protect them against rusting, corrosion or other deterioration." [Emphasis added.] And on this score, the term "treatment" is broad enough to encompass any form of process for the designated purpose. Thus, "treatment" is defined in *Webster's Third New International Dictionary, Unabridged* (1966 ed.) as:

> 1: the action or manner of treating: as * * * c: subjection of something to the action of an agent *or process* * * * [Emphasis added.]

Additionally, even before the enactment of headnote 1, it had been held under the Tariff Act of 1930 that the process by which the enamel was applied was irrelevant. Thus in the *Globe* case, *supra*, the court stated (31 CCPA at 97) :

> We do not regard the process of applying the lacquer as being of any particular importance upon the issue here involved. Whatever it may have been, the resulting product was a steel sheet coated on one side. * * *

Defendant further argues that the customary method of selling coated steel sheets is to customer specification and that in some cases the type of enamel the customer orders restricts the formability of the steel, which in turn allegedly limits the end product to "a class of uses." The short answer to this contention is that even if "coating with enamel" should restrict formability, that is irrelevant to considerations of classification since, by virtue of headnote 1, "coating with enamel" is a statutorily recognized process to which sheet steel may be subjected without losing the right to be classified as a basic shape or form of steel. In this circumstance, no amount of analysis, based upon prior statutes which had no comparable headnote, permits the ignoring of this plain Congressional mandate that enamel coated steel sheet is to be classified under Part 2 of Schedule 6.

Nor, for the following reasons, does the record support the contention of defendant in this regard. The evidence showed that the imported sheets involved three grades of steel: (1) cold rolled commercial quality; (2) cold rolled drawing quality aluminum killed;

and (3) hot dipped galvanized. When outdoor use was intended, hot dipped galvanized was normally selected. However, if the increased corrosion resistance provided by the hot dipped galvanized was not required in the end product use, cold rolled steel was ordinarily selected. The evidence also showed that cold rolled commercial quality steel has less ability to withstand forming—less fabricability—than cold rolled drawing quality aluminum killed steel which is more expensive. Accordingly, unless the contemplated end use required the superior quality of cold rolled drawing quality aluminum killed steel, it was not ordinarily selected. Thus, as a result of the selection of the grade or quality of the steel, the end user was restricted to some extent in the number of products that could be manufactured.

This is an inherent and essential characteristic applicable to all basic shapes and forms of steel. The same characteristic is equally applicable to enamel coated steel. In this latter respect, the imported steel was coated with three types of enamel: alkyd; silicon alkyd; and polyvinyl chloride. These three types of coating were out of an available selection of some eleven types of coating. And, as previously pointed out, one or another of these kinds of coating will withstand any draw or formability that the imported steel will withstand. See note 3, *supra*. There is thus nothing inherent about the coating of steel which restricts the fabricability of the metal. Nor is there any difference between the ultimate user selecting various grades of steel for various end uses and selecting various grades of coating for end uses. This was emphasized by the testimony of one of plaintiffs' witnesses to the effect that a customer normally selects not only the least expensive grade of steel commensurate with the end use of the product, but also the least expensive coating.

Defendant next argues that prepainted steel sheets do not constitute a basic shape or form of steel because they are not listed in the American Iron and Steel Institute's *Steel Products Manual* which contains the quality standards for all standard sheet products. The difficulty with this contention is that headnote 1 contains specific provisions which make clear that for tariff purposes a steel sheet coated with enamel is a basic shape or form. See also *Filbin* I, *supra; United States* v. *Globe Shipping Co., Inc., supra.*

Finally, defendant points out that headnote 1 provides that "[*u*]*nless the context requires otherwise,* the provisions of this part apply to the products described * * *." [Emphasis added.] According to defendant, in light of this language and the facts heretofore presented, the "context" requires that the imported merchandise be excluded from the scope of Part 2, Schedule 6 as an article of steel in its basic shape or form. That argument, however, misconceives the purpose of the quoted language which manifestly is to provide for situations where

the textual provisions of Part 2, Schedule 6 are inconsistent with the headnote 1 provisions.

In sum, plaintiffs' claim is sustained and it is held that the importations are properly classifiable as steel sheets, with the cold rolled steel coils dutiable under item 608.87 and the galvanized steel coils dutiable under item 608.95. Judgment will be entered accordingly.